IN THE SUPREME COURT OF THE STATE OF KANSAS

No. 119,027

In the Matter of GREGORY V. BLUME,
*Respondent.*

ORIGINAL PROCEEDING IN DISCIPLINE

Original proceeding in discipline. Opinion filed June 28, 2019. Indefinite suspension.

*Penny R. Moylan*, Deputy Disciplinary Administrator, argued the cause, and *Stanton A. Hazlett*, Disciplinary Administrator, was with her on the brief for the petitioner.

*Gregory V. Blume*, respondent, argued the cause and was on the briefs pro se.

PER CURIAM:  This is an original proceeding in discipline filed by the office of the Disciplinary Administrator against the respondent, Gregory V. Blume, an Overland Park attorney admitted to the practice of law in Kansas in 1977.

On September 8, 2017, the office of the Disciplinary Administrator filed a formal complaint against the respondent alleging violations of the Kansas Rules of Professional Conduct (KRPC). The respondent timely filed an answer to the complaint on October 2, 2017. A hearing was held on the complaint before a panel of the Kansas Board for Discipline of Attorneys on November 21, 2017, where the respondent was personally present and was represented by counsel, Jonathan C. Becker. The hearing panel determined that respondent violated KRPC 3.1 (2019 Kan. S. Ct. R. 349) (meritorious claims and contentions); 3.3(a)(1) (2019 Kan. S. Ct. R. 350) (candor toward tribunal); 3.4(d) (2019 Kan. S. Ct. R. 353) (compliance with discovery request); 4.4(a) (2019 Kan. S. Ct. R. 363) (respect for rights of third persons); 8.4(c) (2019 Kan. S. Ct. R. 387)

1

(conduct involving dishonesty, fraud, deceit, or misrepresentation); and 8.4(d) (conduct prejudicial to the administration of justice).

The hearing focused on whether the respondent's behavior with respect to four issues should lead to disciplinary sanction under the rules cited in the complaint. The first issue arose out of the inadequacy of his response to a discovery request. The second and third arose out of two incidents that occurred during a deposition, when he called the videographer a Nazi and, in common parlance, flipped off a representative of an opposing party. The fourth issue arose out of his motion to set aside an earlier agreed judgment.

After the hearing, the panel made findings of fact and arrived at conclusions of law and a disciplinary recommendation for this court. They read in pertinent part:

"*Findings of Fact*

. . . .

"8.     L.O., a co-owner of Superior Acquisition Group, Inc. (hereinafter 'Superior') was married to G.O. G.O. did not have an individual ownership interest in Superior.

"9.     In May, 2011, First National Bank of Omaha (hereinafter 'FNBO') loaned $1,900,000 to Superior in three separate financing agreements:  a $300,000 line of credit and two $800,000 term loans. The loans were cross-collateralized and secured by various properties, including a certificate of deposit owned by L.O. and G.O., with a value of $100,282.

"10.     Both L.O. and G.O. signed an agreement pledging the certificate of deposit as security for the three loans. According to the pledge agreement, FNBO could take possession of the certificate of deposit upon default of any of the three loans.

2

"11.    In June, 2011, L.O. and G.O. opened a money market account at FNBO and transferred the balance of the pledged certificate of deposit to the money market account.

"12.    FNBO required L.O. and G.O. to execute another agreement, pledging the money market account as security for the three financing agreements because that account now contained the proceeds of the previously pledged certificate of deposit.

"13.    On March 27, 2012, J.S. of FNBO sent L.O. an email message [that] stated, 'Please sign this and get back to me ASAP sir, for some reason this slipped through the cracks or we misplaced it?'

"14.    According to L.O., he explained to J.S. that G.O. was not available to sign the agreement. Also according to L.O., J.S. instructed L.O. to sign G.O.'s name because [J.S.] needed the pledge agreement signed that day. L.O. did not have authorization from G.O. to sign her name. L.O. signed his name and G.O.'s name to the money market pledge agreement.

"15.    In May 2012, the $300,000 line of credit matured and Superior defaulted on the loan. Superior's default on the $300,000 line of credit triggered a default on the other two loans.

"16.    On June 8, 2012, pursuant to the money market pledge agreement, FNBO seized $186,000 from the money market account.

"17.    In September 2012, FNBO filed suit against L.O., Superior, and the other owner of Superior, in Johnson County District Court, case number 12-CV-7213. On February 11, 2013, the parties entered into a stipulated journal entry granting summary judgment and foreclosure on Superior's property. [District Judge David W. Hauber] entered judgment against all three defendants for $1,555,142.66.

"18.     On June 6, 2014, the respondent filed suit against FNBO on behalf of G.O., regarding its seizure of the money market account. The petition alleged:

. . . .

'38.     On March 27, 2012, Defendant Bank represented to [L.O.] that it needed his signature and [G.O.]'s signature on a document that it had misplaced or that had fallen through the cracks.

'39.     On March 12, [*sic*] 2012, Defendant Bank represented to [L.O.] that it needed the signatures that day.

'40.     Upon being informed that [G.O.] was unavailable, Defendant Bank instructed [L.O.] to sign [G.O.'s] name.

'41.     Defendant Bank then faxed the signature page only to [L.O.]'s office.

'42.     [L.O.] signed his name and [G.O.]'s name to the signature page and returned it to the Defendant Bank, as instructed.'

"19.     On May 7, 2015, FNBO served its first request for production of documents on G.O. FNBO requested that G.O., '[p]roduce each and every document evidencing, concerning, or memorializing any and all communications between [J.S.] and [L.O.].' FNBO clearly requested J.S.'s March 27, 2012, email message in the first request for production.

"20.     On June 3, 2015, L.O. filed a chapter 7 voluntary petition in bankruptcy.

"21.     On June 9, 2015, the respondent filed G.O.'s responses to FNBO's first request for production of documents, and identified '[o]ne email from [J.S.] to Defendant [*sic*] will be produced at the Law Offices of Gregory V. Blume, 7199 West 98th Terrace, Suite 130, Overland Park, Kansas 66212' as a document to be produced.

4

"22. Subsequently, on July 24, 2015, FNBO's counsel emailed the respondent, confirming the parties' agreement that FNBO would inspect and copy responsive documents at respondent's office on July 28, 2015. On July 27, 2015, respondent sent an email message to FNBO's counsel, as follows:

'. . . As you know, [L.O.] filed bankruptcy in May. Because of the bankruptcy stay, [L.O.] did not respond to his set of RPDs. When we were last in Court on June 15th, you told Judge [James F.] Vano that you planned to seek relief from the automatic stay. We have not received anything to that effect and we have no documents from [L.O.]. He wants to hire his own counsel now and I have recommended a competent young woman. Many of your document request [*sic*] for [G.O.] relate to [L.O.]'s documents. [G.O.] herself does not have many documents of her own. We have scanned in what she has. We understand that she has a continuing duty to supplement these. This may save you some time and gas. Please let me know if you plan to come out and review the hard copies of the attached. GVB'

The respondent attached an 80-page document to the email message. The respondent did not include J.S.'s March 27, 2012[,] email within these documents. FNBO's counsel replied to the respondent on July 27, 2012, stating, '[i]f the PDF contains a copy of all documents currently in your possession, then I see no reason to come out to your office tomorrow and review the hard copies at this time.'

"23. The respondent did not reply to this email message or otherwise indicate that he had any other additional documents in his possession that were not contained within the 80-page attachment.

"24. The respondent did not produce the March 27, 2012, email until J.S.'s deposition on August 18, 2015. After FNBO's counsel completed his direct examination of J.S., the respondent offered the March 27, 2012, email as Exhibit 26 to the deposition. FNBO's counsel objected to the introduction of [the] March 27, 2012, email message

5

because it had not been previously produced to FNBO in response to its request for production of documents. The respondent indicated that he did not provide the email message during discovery because '[i]t's a document produced by [L.O.]. His document requests are not due yet' [due to the bankruptcy filing].

"25.    On September 4, 2015, FNBO filed an adversary proceeding in L.O.'s bankruptcy, seeking to have its judgment declared to be nondischargeable, claiming that L.O. forged G.O.'s signature on several loan documents and overstated real property values on two personal financial statements.

"26.    On September 10, 2015, FNBO filed a motion for sanctions based on the respondent's failure to timely produce the March 27, 2012, email message. The respondent filed a memorandum in opposition to the motion for sanctions on September 28, 2015, arguing that (1) the email message was FNBO's document and G.O. was not obligated to produce a copy of a document which FNBO had in its possession, (2) FNBO failed to produce this document to the respondent, (3) the respondent's failure to produce the email message was inadvertent, and (4) counsel for FNBO neglected to contact the respondent about the omission.

"27.    That same day, on September 10, 2015, [District Judge James F. Vano] held a status conference. During the status conference, the respondent stated that he did not produce the email message during discovery because 'it's an impeachment document.'

"28.    On November 13, 2015, [Judge Vano] held a hearing on the motion for sanctions. Regarding the March 27, 2012, email message, the respondent stated, 'Judge, we didn't withhold it. I considered it an impeachment document.' But, yet, still later in that same hearing, the respondent stated, '[i]t was [L.O.]'s document. When he took bankruptcy, I couldn't go near him.' Ultimately, the following exchange between the respondent and the court occurred:

'THE COURT:  You're admitting you did not include that in your

responses to the request for production of documents.

6

'MR. BLUME:  Not at that time.

'THE COURT:  Because you were holding it back—

'MR. BLUME:  No. I didn't have it.

'THE COURT:  —for impeachment?

'MR. BLUME:  No.

'THE COURT:  You had it when the deposition started; didn't you?

'MR. BLUME:  Yes, [L.O.] gave it to me.

'THE COURT:  Was he present for [J.S.]'s deposition?

'MR. BLUME:  Of course not. That's why—it was up in Nebraska.

'THE COURT:  You had it before the deposition started?

'MR. BLUME:  Yes, sir.

'THE COURT:  And you knew at that point in time you had not produced it in response to the request for production of documents. Is that what you are saying?

'MR. BLUME:  No, sir. I am saying I considered it an impeachment document at that time that I probably wouldn't need, because I couldn't believe they would submit perjurious testimony.

'THE COURT:  Did you produce it in response to the request for production of documents?

7

'MR. BLUME: I did—as a supplement response? I did not produce it at the time, because I didn't have it at the time.

'THE COURT: Prior to the deposition of [J.S.]?

'MR. BLUME: No. I did not. Gave it to me a week before the deposition.'

Based upon the evidence presented to [him], [Judge Vano] found:

'THE COURT: All right. It appears to the Court that [G.O.] had access to, if not the actual document in hand, Exhibit 26, the attachment to the motion for sanctions at the time of drafting the petition. The language in Paragraphs [*sic*] 11 of the petition referencing communication between [J.S.] and [L.O.] and [G.O.]'s petition in Paragraph 11 and in Paragraph 38 so closely mirrors the language in the e-mail that it appears to the Court that [G.O.] had the document at the time of the petition. The document's [*sic*] clearly covered by the request for all production of documents, Paragraph 6, 15, and 27, at a minimum; and it clearly was not produced. It was held back as indicated on purpose for the purposes of impeachment. That defeats the purpose of discovery.

. . . .

'. . . The only sanction that appears to be appropriate is dismissal of the case. So, [G.O.]'s petition is dismissed on that basis.'

Even though G.O.'s claims were dismissed, the litigation remained pending because FNBO had previously filed counterclaims and cross-claims.

"29.     On February [16], 2016, the respondent filed a motion to alter or amend the February 3, 2016, journal entry. In the motion, the respondent asserted that he had properly disclosed the March 27, 2012, email message. The respondent stated, '[it] was

8

clear that [G.O.] disclosed the [J.S.] email and had it ready and available for counsel to pick up on June 9, 2015' and he 'clearly made the document available.' The respondent did not acknowledge that prior to the agreed inspection date, the respondent assured opposing counsel that he had scanned and emailed all responsive documents in his possession.

"30. On March 4, 2016, counsel for FNBO opposed the respondent's motion to alter or amend the journal entry, arguing that the respondent had taken 'at least five different positions' regarding the disclosure of the March 27, 2012, email.

"31. During a March 22, 2016, deposition of G.O., the respondent called the deposition videographer, D.M., a 'Nazi.' From a previous encounter, the respondent had come to learn that D.M. had German ancestry. D.M. did nothing to provoke this attack and was offended by the respondent's comment. During this same deposition, the respondent intentionally gestured using his middle finger toward J.W., a[n] FNBO representative. Both J.W. and D.M. witnessed this gesture. J.W. was offended by the respondent's gesture.

"32. Consequently, on April 20, 2016, FNBO filed a motion asking the court to hold the respondent in indirect contempt of court. While the respondent filed a memorandum in opposition to FNBO's motion to hold the respondent in indirect contempt on May 9, 2016, the respondent failed to address the allegations that on March 22, 2016, he called D.M. a Nazi and he gestured using his middle finger to J.W. The respondent complained that FNBO's counsel was 'going after' the respondent 'for allegations that occurred two years ago.' However, the allegations regarding the respondent's conduct at the deposition occurred just less than one month prior to the filing of the motion.

"33. On June 27, 2016, [Judge Vano] took up the respondent's motion to alter or amend as well as FNBO's motion to hold the respondent in indirect contempt. During that hearing, the respondent testified that he did not recall calling D.M. a Nazi, that he gestured using his middle finger toward J.W. after being provoked, and that he apologized to J.W. According to J.W., he did not provoke the respondent and the

9

respondent never apologized to him. The district court concluded that there 'seems to be a continuing lack of civility on the part of [the respondent].' However, the court concluded that because he did not previously adopt civility guidelines, he did not make a contempt finding.

"34. On June 29, 2016, FNBO filed [a disciplinary] complaint against the respondent.

"35. On July 1, 2016, [Judge Vano] issued a memorandum decision and order denying respondent's motion to alter or amend the February 3, 2016, journal entry. The court stated:

'This dispute is centered upon a document (herein referred to as "Exhibit 26" or as "the document" or "the exhibit") that was not produced until [G.O.] was about to begin cross-examination of a defense witness during his deposition held in Kearney, Nebraska, as an out-of-state witness to be used for trial in this case.

'The findings previously made by the Court are again adopted in this decision. Language in the document was quoted in the Petition for Damages. The document was clearly requested within the meaning of several discovery requests. The document was not produced until [G.O.] began her cross-examination of the witness, [J.S.], in Nebraska. [G.O.] and [the respondent] had the document in their possession or control from the beginning of this case. The [respondent] willfully and intentionally withheld the document from production, either on his own accord or with consent of [G.O.], believing he could do so for "impeachment purposes" rather than answer the discovery responses timely and truthfully and without the subterfuge and the duplicity that they have used in this case.

'As pointed out by the Defendant, [the respondent] has adopted differing versions of the facts surrounding production of Exhibit 26.

10

They are not consistent and appear disingenuous. This Motion is difficult to address as we fight our way through a tangled web of some irrelevant ramblings and vagaries raised by [the respondent].

'At one time, [the respondent] claimed the document, an email from [J.S.] to [L.O.], was available for inspection at [the respondent]'s office. He even cites to that response in this Motion to Alter or Amend currently before the Court. He says that on June 9, 2015, he sent the following to counsel for the Defendant in response to a request for production of documents:

> "One email from [J.S.] to Defendant [*sic*] will be produced at the Law Offices of Gregory V. Blume, 7199 W. 98th Terrace, Suite 130, Overland Park, Kansas 66212."

Arrangements were made by [FNBO's counsel] on July 24, 2015, to review [G.O.]'s documents at [the respondent]'s office on July 28, 2015. However, on July 27, 2015, [the respondent] sent an email to [FNBO's counsel] in which he indicated that he had scanned what [G.O.] has and sent a PDF attachment to [FNBO's counsel] to review in the hope of saving him "some time and gas" to review the hard copies. [FNBO's counsel] took the PDF attachment as an indication that all documents were then produced. However, the document was not in the 80-page file which [the respondent] sent and which [FNBO's counsel] was led to believe contained all of the documents for production without any need for him to visit [the respondent]'s office for others. Nevertheless, in his Motion to Alter or Amend, [the respondent] writes,

> "However, [Defendant's] counsel never contacted the undersigned regarding the [J.S.] email after receiving [G.O.]'s disclosure, the very email for which counsel

11

requested sanctions [*i.e.,* Exhibit 26, the March 27, 2012, [J.S.] email]."

Furthermore, despite [the respondent]'s indication that he told [FNBO's counsel] he had the exhibit in his office on June 9, 2015, [the respondent] stood before this Court on November 13, 2015, and told the Court he did not produce the document because he did not have it and that he did not have it until "a week before the deposition." The deposition of [J.S.] was on August 18, 2015.

'Even if [the respondent]'s incongruent versions of the facts were carefully parsed in order to extract facts favorable to [G.O.], [the respondent] clearly had Exhibit 26 in his possession before he drove to Nebraska for the deposition and before the start of the deposition of [J.S.]. He could have given the document to [FNBO's counsel] at that time. [G.O.] had a duty to supplement her discovery responses even then. Clearly, [the respondent] had intended all along to withhold the document and use it to impeach or at the very least embarrass [J.S.] when [G.O.] had a plain duty to comply with discovery. The facts found support the conclusion that [the respondent] was intentionally less than forthcoming in the discovery process. In fact, it appears that by producing the PDF to [FNBO's counsel] the day before his planned visit to [the respondent]'s law office, without including what was later marked as Exhibit 26, [G.O.] intended to obfuscate, confuse, and mislead [FNBO's counsel].

. . . .

'. . . What is clear is that [G.O.] takes no responsibility whatsoever for withholding the requested document in the improper manner that it was done.

. . . .

12

'CONCLUDING: This motion presents two significant concerns for the Court. The first is the discovery concern, *i.e.*, the failure to produce the document. [G.O.] had the document when the Petition for Damages was drafted, included language from the document in her pleadings, and in response to discovery [G.O.] told the Defendant it had the document on June 9, 2015. But then, [the respondent] decided to send all documents which [G.O.] had and that Defendant requested via her PDF attachment to save "time and gas" yet failed to include the very document which she knew she had and had identified as being available for inspection. Finally, despite not producing it in response to discovery and despite having clear possession of the document in Nebraska prior to the beginning of [J.S.]'s deposition, still did not timely supplement her discovery responses or produce it until beginning cross-examination of the witness, indicating it was intentionally withheld for impeachment of what [the respondent] calls "perjurious testimony" from the Defendant.

'The second concern is the lack of candor to the Court and opposing counsel. [The respondent] told the Court he did not have the document until a week before the Nebraska deposition. That is an obvious misstatement made clear now in the Motion to Alter or Amend. [The respondent] told Defendant's counsel he had the document in June, two months before the deposition and it is clear he had used the document prior to that time when he drafted the Petition for Damages. Then [the respondent] sent the incomplete and misleading PDF attachment to [FNBO's counsel] the day before he was scheduled to inspect all of the requested documents at [the respondent]'s office. [The respondent], a very experienced courtroom lawyer, told the Court he did not think he had to produce the document because he was going to use it for cross-examination. His conduct appears, therefore, to have been calculated and intentional.

13

'There must certainly be alternative remedies the Court could further consider. However, the Court cannot divorce the two major concerns and does not think it is appropriate to consider alternative sanctions or conditions for reinstatement of [G.O.]s' case so long as [the respondent] refuses to acknowledge his lack of candor with opposing counsel and with the Court concerning his and his client's intentional failure to comply with discovery. A mere discovery abuse could be dealt with by sanctions and conditions, *e.g.*, including disallowing Exhibit 26 and any testimony concerning that document or its contents, and disallowing any cross-examination of [J.S.], among other considerations. However, without any acknowledgment of the discovery abuse and without any acknowledgment of the duplicity and lack of candor to any degree coming from [G.O.], the judicial process is undermined and any less sanction appears to be unjust punishment and unfair to both sides of this case. Under the circumstances, dismissal of [G.O.]'s claims is the only appropriate remedy.'

"36.    The judge forwarded a copy of the memorandum decision to the disciplinary administrator's office. The disciplinary administrator docketed the memorandum decision as a complaint against the respondent.

"37.    On July 5, 2016, on behalf of L.O., the respondent filed a motion to set aside the February 11, 2013, stipulated journal entry. *See* ¶ 17, above. The respondent argued that the stipulated journal entry was void because, contrary to [a] chamber rule [of Judge Hauber], L.O.'s former attorney signed the journal entry, without having L.O. sign the journal entry. On July 19, 2016, FNBO filed a response to the motion. On July 26, 2016, [Judge Hauber] denied the respondent's motion to set aside the stipulated journal entry, finding it was not factually or legally supported.

"38.    Then, on July 20, 2016, FNBO filed a motion for sanctions against the respondent and L.O., pursuant to K.S.A. 60-211, alleging that the respondent's July 5, 2016[,] motion to set aside was frivolous. The respondent filed a response in opposition on August 5, 2016.

14

"39.    On August 9, 2016, [Judge Hauber] held a hearing on FNBO's motion for sanctions. During the hearing, the court informed the respondent that his argument in his motion for setting aside the stipulated journal entry was frivolous.

"40.    On August 25, 2016, the bankruptcy court ruled against FNBO in the adversary proceeding, concluding that FNBO 'wholly failed to carry its burden . . . to show that the values listed were materially false.'

"41.    On September 13, 2016, [Judge Hauber] entered [his] written order granting FNBO's motion for sanctions against L.O. and the respondent. In the order, [Judge Hauber] described the respondent's argument to set aside a journal entry as 'in defiance of common sense.' The court reiterated that the respondent's motion to set aside the journal entry 'was not factually or legally supported.' The court stated that the respondent's

> '. . . motion to set aside a long ago finalized judgment based on the excuse that this Court's division rule somehow required even represented individual parties to sign alongside their counsel's signature was a patently frivolous argument and delaying tactic. It was contrary to all local and statutory rules. It was contrary to common sense and even a reasonable interpretation of this division [*sic*] guidelines, read in conjunction with Local Rule 34 makes clear that judges do not want counsel to submit proposed orders for contested matters without first obtaining a hearing on the motion for the proposed order or having the other side agree to the same by signing off on such an order. When a party is already represented by counsel, clearly the rules require counsel, but not represented parties, . . . signing any proposed order.'

Further[,] the court stated, 'the Court finds that both the factual and legal basis for the motion to set aside was frivolous, justifying sanctions against counsel personally.' The court concluded that the respondent's strategy was 'deliberate and not negligent' and imposed a sanction of $3,250 plus the transcript costs against L.O. and the respondent.

15

Later, as part of a confidential settlement agreement, FNBO agreed to release its claim to the award of sanctions against L.O. and the respondent.

"*Conclusions of Law*

"42.    Based upon the findings of fact, the hearing panel concludes as a matter of law that the respondent violated 3.1 (meritorious claims and contentions), 3.3(a)(1) (candor to the tribunal), 3.4(d) (fairness to opposing party and counsel), 4.4(a) (respect for the rights of third persons), 8.4(c) (misconduct involving dishonesty, fraud, deceit, or misrepresentation), and 8.4(d) (misconduct prejudicial to the administration of justice[)], as detailed below.

"Rule 3.1

"43.    Attorneys are prohibited from bringing or defending a proceeding unless there is a basis for doing so that is not frivolous. Rule 3.1. On February 22, 2016, on behalf of G.O., the respondent filed a motion to alter or amend the February 3, 2016, journal entry. The court held, and the hearing panel agrees, that the respondent's motion to alter or amend the February 3, 2016, journal entry contained 'a tangled web of some irrelevant ramblings and vagaries.' On July 5, 2016, on behalf of L.O., the respondent filed a motion to set aside the February 11, 2013, journal entry. The court held, and the hearing panel agrees, that the respondent's motion to set aside the journal entry was frivolous. As such, the hearing panel concludes that the respondent violated Rule 3.1.

"Rule 3.3(a)(1)

"44.    Rule 3.3(a)(1) provides that '[a] lawyer shall not knowingly make a false statement of material fact or law to a tribunal.' In this case, the court found that the respondent received the March 27, 2012, email prior to filing suit on behalf of G.O. Based on the language used in the petition, the hearing panel likewise believes that the respondent received the March 27, 2012, email prior to filing suit on behalf of G.O. However, in order to find a violation of Rule 3.3(a)(1), the hearing panel is not required to make that finding. The respondent admits that he had the email prior to June 9, 2016,

16

when he filed G.O.'s responses to FNBO's first request for production of documents. When the respondent stated to the court that he had not received the March 27, 2012, email message until one week prior to the August 18, 2015, deposition of J.S., the respondent made a false statement of material fact. Because the respondent made a false statement of material fact to the court, the hearing panel concludes that the respondent violated Rule 3.3(a)(1).

"Rule 3.4(d)

"45.     'A lawyer shall not . . . in pretrial procedure, make a frivolous discovery request or fail to make a reasonably diligent effort to comply with a legally proper discovery request by an opposing party.' Rule 3.4(d). The respondent failed to make a reasonably diligent effort to comply with a legally proper discovery request when he failed to provide the March 27, 2012, email message to counsel for FNBO. Thus, the hearing panel concludes that the respondent violated Rule 3.4(d).

"Rule 4.4(a)

"46.     'In representing a client, a lawyer shall not use means that have no substantial purpose other than to embarrass, delay, or burden a third person.' Rule 4.4(a). When the respondent presented J.S. with the March 27, 2012, email message during the deposition, he had no substantial purpose other than to embarrass J.S. Additionally, in the course of representing G.O. and L.O., the respondent filed a number of motions which had no substantial purpose other than to delay the proceedings and to burden FNBO. Moreover, when the respondent called D.M. a Nazi, the respondent used means that had no substantial purpose other than to embarrass D.M. Finally, when the respondent gestured to J.W. using his middle finger, the respondent used means that had no substantial purpose other than to embarrass J.W. The respondent exhibited a lack of respect for the rights of third persons when he repeatedly used means that had no substantial purpose other than to embarrass, delay, or burden them and, thus, the hearing panel concludes that the respondent repeatedly violated Rule 4.4(a).

17

"47.     'It is professional misconduct for a lawyer to . . . engage in conduct involving dishonesty, fraud, deceit or misrepresentation.' Rule 8.4(c). The respondent engaged in conduct that involved dishonesty when he falsely stated to the court that he had not received the March 27, 2012, email message from J.S. until one week prior to the August 18, 2015, deposition. Accordingly, the hearing panel concludes that the respondent violated Rule 8.4(c).

"Rule 8.4(d)

"48.     'It is professional misconduct for a lawyer to . . . engage in conduct that is prejudicial to the administration of justice.' Rule 8.4(d). The respondent engaged in conduct that was prejudicial to the administration of justice when he filed the motion to alter or amend the February 3, 2016, journal entry and when he filed the motion to set aside the February 11, 2013, journal entry. The respondent's frivolous filings caused prejudice to the administration of justice. As such, the hearing panel concludes that the respondent violated Rule 8.4(d).

"*American Bar Association*
*Standards for Imposing Lawyer Sanctions*

"49.     In making this recommendation for discipline, the hearing panel considered the factors outlined by the American Bar Association in its Standards for Imposing Lawyer Sanctions (hereinafter 'Standards'). Pursuant to Standard 3, the factors to be considered are the duty violated, the lawyer's mental state, the potential or actual injury caused by the lawyer's misconduct, and the existence of aggravating or mitigating factors.

"50.     *Duty Violated*. The respondent violated his duty to the legal profession and the legal system to refrain from filing frivolous pleadings. The respondent violated his duty to the legal profession, the legal system, and the public to maintain his personal integrity.

18

"51.     *Mental State*. The respondent knowing[ly] and intentionally violated his duties.

"52.     *Injury*. As a result of the respondent's misconduct, the respondent caused actual injury to the administration of justice.

"53.     *Aggravating and Mitigating Factors*. Aggravating circumstances are any considerations or factors that may justify an increase in the degree of discipline to be imposed. In reaching its recommendation for discipline, the hearing panel, in this case, found the following aggravating factors present:

  a.     <u>Prior Disciplinary Offenses</u>. The respondent has been previously disciplined on two occasions. In 2010, the respondent participated in the attorney diversion program for violating Rule 8.4(d). In 2015, the disciplinary administrator informally admonished the respondent for violating Rules 4.4 (respect for the rights of third persons) and 8.4 (professional misconduct).

  b.     <u>Dishonest or Selfish Motive</u>. While the respondent did not appear to have a selfish motive, the respondent's misconduct was clearly motivated by dishonesty.

  c.     <u>A Pattern of Misconduct</u>. The respondent engaged in a pattern of misconduct within this case by repeatedly failing to show respect for the rights of third persons. Additionally, the respondent engaged in a pattern of misconduct as the misconduct in the earlier disciplinary cases is similar to the misconduct in this case.

  d.     <u>Multiple Offenses</u>. The respondent committed multiple rule violations. The respondent violated Rules 3.1, 3.3(a)(1), 3.4(d), 4.4(a), 8.4(c), and 8.4(d).

  e.     <u>Refusal to Acknowledge Wrongful Nature of Conduct</u>. The respondent refused to acknowledge the wrongful nature of his misconduct.

19

f.      Substantial Experience in the Practice of Law. The Kansas Supreme Court admitted the respondent to practice law in the State of Kansas in 1977. At the time of the misconduct, the respondent had been practicing law for nearly 40 years.

"54.     Mitigating circumstances are any considerations or factors that may justify a reduction in the degree of discipline to be imposed. In reaching its recommendation for discipline, the hearing panel, in this case, found the following mitigating circumstances present:

a.      Previous Good Character and Reputation in the Community Including Any Letters from Clients, Friends and Lawyers in Support of the Character and General Reputation of the Attorney. The respondent is an active and productive member of the bar of Johnson County, Kansas. The respondent also enjoys the respect of clients as evidenced by several letters received by the hearing panel.

b.      Remoteness of Prior Offenses. The discipline imposed in 2010 is remote in time to the misconduct in this case.

"55.     In addition to the above-cited factors, the hearing panel has thoroughly examined and considered the following Standards:

'6.12    Suspension is generally appropriate when a lawyer knows that false statements or documents are being submitted to the court or that material information is improperly being withheld, and takes no remedial action, and causes injury or potential injury to a party to the legal proceeding, or causes an adverse or potentially adverse effect on the legal proceeding.

'7.2    Suspension is generally appropriate when a lawyer knowingly engages in conduct that is a violation of a duty owed as a

20

professional, and causes injury or potential injury to a client, the public, or the legal system.'

"*Recommendation*

"56.    The disciplinary administrator recommended that the respondent's license to practice law be suspended for a period of one year. Counsel for the respondent agreed that the underlying period of suspension should be one year, but counsel for the respondent recommended that the imposition of the suspension be suspended and the respondent be placed on probation subject to the terms and conditions proposed in the probation plan.

"57.    When a respondent makes a request to be placed on probation, the hearing panel is obligated to consider Rule 211(g) to determine whether consideration of probation is appropriate.

'(3)    The Hearing Panel shall not recommend that the Respondent be placed on probation unless:

(i)    the Respondent develops a workable, substantial, and detailed plan of probation and provides a copy of the proposed plan of probation to the Disciplinary Administrator and each member of the Hearing Panel at least fourteen days prior to the hearing on the Formal Complaint;

(ii)    the Respondent puts the proposed plan of probation into effect prior to the hearing on the Formal Complaint by complying with each of the terms and conditions of the probation plan;

(iii)    the misconduct can be corrected by probation; and

21

(iv)     placing the Respondent on probation is in the best interests of the legal profession and the citizens of the State of Kansas.'

"58.     The plan that the respondent proposed is wholly inadequate to address the problems presented in this case. The hearing panel concludes that the respondent failed to develop a workable, substantial, and detailed plan of probation. The respondent did not provide a copy of the proposed plan of probation to the disciplinary administrator and each member of the hearing panel at least fourteen days before the hearing on the formal complaint. The respondent provided no testimony that he implemented the proposed plan of probation. Further, the misconduct cannot be corrected by probation. *See In re Stockwell*, 296 Kan. 860, 868, 295 P.3d 572 (2013) ('Moreover, this court is generally reluctant to grant probation where the misconduct involves fraud or dishonesty because supervision, even the most diligent, often cannot effectively guard against dishonest acts.') Also, probation is not appropriate when the respondent does not take responsibility for his misconduct. Finally, placing the respondent on probation is not in the best interests of the legal profession and the citizens of the State of Kansas.

"59.     The hearing panel concludes that the requirements of Rule 211(g) prohibit the hearing panel from considering probation in this case.

"60.     The respondent repeatedly engaged in misconduct in this case. While the respondent is entitled to deny violating the rules, the respondent's failure to recognize or refusal to acknowledge his misconduct is troubling to the hearing panel because the respondent so obviously violated many rules. Accordingly, based upon the findings of fact, conclusions of law, and the Standards listed above, the hearing panel unanimously recommends that the respondent's license to practice law be suspended for a period of one year. The hearing panel further recommends that prior to reinstatement, the respondent be required to undergo a hearing pursuant to Kan. Sup. Ct. R. 219. At the reinstatement hearing, the hearing panel recommends that the respondent establish, by clear and convincing evidence, that he understands how he violated the rules and that he understands the disrepute he brought to the profession by his actions. Further, the hearing panel recommends that the hearing panel appointed to consider any petition for

22

reinstatement filed by the respondent not recommend reinstatement unless [its members] are convinced that recurrence of the misconduct is unlikely."

The respondent filed two motions pro se to extend his deadline for filing exceptions to the panel's Final Hearing Report. In the second motion, he stated, "Respondent's chosen counsel is unavoidably engaged in a more critical matter, and therefore Respondent will have to proceed as a *pro se*."

The motions to extend were granted, and the respondent later filed numerous exceptions to the panel's findings and conclusions pro se. His exceptions included several attachments, none of which had been admitted into evidence before the hearing panel or otherwise previously made a part of the record of this case.

After two extensions of time were granted by this court, the respondent was forced to file a motion to file his otherwise untimely brief instanter. When that motion was granted, his brief was filed pro se on August 16, 2018. The brief repeated much of the material in respondent's exceptions. It also retreated from respondent's counsel's statement at the panel hearing about the appropriate disciplinary sanction. Respondent argued that a one-year suspension was not supported by the evidence and recommended a less severe sanction, such as probation or a still lesser sanction.

The Disciplinary Administrator's office filed a timely responsive brief. It continued to advocate for a one-year suspension with a requirement for a reinstatement hearing under Supreme Court Rule 219 (2019 Kan. S. Ct. R. 270).

The respondent filed a timely reply brief pro se. In that brief—which attached three letters of support apparently signed by three clients, D.P., T.M, and W.O.—the respondent again asserted that he should receive no sanction more serious than probation.

A week after the reply brief was filed, on October 10, 2018, Becker sought to withdraw as the respondent's counsel, citing a "difference of strategy and defenses" that had arisen between him and his client. The motion was denied "on present showing" on October 25, 2018, and the denial order directed Becker's attention to Supreme Court Rule 1.09(b)(1)(B) (2019 Kan. S. Ct. R. 8), which concerns the evidence a withdrawing attorney must provide on notice and information that has been provided to the attorney's client.

On November 1, 2018—after the parties had been notified that this case was set for oral argument before this court on December 12, 2018—Becker filed a renewed motion to withdraw as counsel for the respondent. The renewed motion attached a copy of a letter that had been hand-delivered to the respondent; the letter notified the respondent of Becker's intention to withdraw and the respondent's responsibility for personal compliance with all orders and time limitations of the court from that point forward. It also notified the respondent of the oral argument date and time.

The same day, the respondent filed a response to the first motion to withdraw. He disputed his soon-to-be-former counsel's recitation that differences between them had arisen, saying there had been "no meaningful communication" since the panel hearing. He also stated, despite his three previous pro se filings, that he

"did assume that Mr. Becker would assist him in preparation for the oral argument. In all fairness, his motion should have been filed six months ago.

". . . Mr. Becker is a fine attorney and advocate, but his defense of the undersigned appeared to be inconsistent and confused.

. . . .

24

". . . [T]he undersigned is in the desert of presuming that Mr. Becker will be allowed to withdraw and that he will have six short weeks, including Thanksgiving, to find new counsel who will not have the advantage of having attended the hearing before the Panel and will have to get up to speed because he or she will lack familiarity with the record."

The respondent then sought a 60-day continuance of oral argument "to allow [him] to hire new counsel and to allow the new attorney to familiarize him or herself with the case."

The next day, the respondent filed a supplemental pleading in support of the continuance of oral argument he had sought the day before. He suggested that Becker's withdrawal had prejudiced his ability to prepare a defense and reiterated the need for additional time to retain new counsel.

The Disciplinary Administrator's office responded, objecting to the continuance of oral argument.

This court granted a continuance of oral argument until January 31, 2019.

At oral argument, the Disciplinary Administrator's office reminded the court that the various attachments to the respondent's exceptions were not admitted into evidence before the panel. It also continued to recommend a one-year suspension with a requirement of a reinstatement hearing under Supreme Court Rule 219.

The respondent appeared in person and without counsel at oral argument. He admitted on questioning from this court that he had never sought new counsel to represent him. His stated reason was that obtaining counsel would have cost "thousands

25

and thousands of dollars." With regard to appropriate sanction, the respondent said he had two remaining cases open and planned to retire in June of this year. When asked about the sanction he believed to be appropriate, he said he should be required to make a written apology to the videographer to whom he made the Nazi statement and be required to make a contribution to St. Jude's Children's Hospital.

After oral argument, the respondent sent three letters to the individual chambers of each justice. The letters and enclosures were filed in this case. The first letter from respondent described the case the respondent was pursuing on behalf of W.O. and enclosed a statement addressed "To whom it may concern" apparently signed by W.O. that spoke gratefully of respondent's assistance. The second letter from the respondent enclosed a second letter from T.M., again praising the respondent. The third letter from the respondent enclosed a letter from D.C., another client of the respondent, who said that he and his wife, his business, and associates needed the respondent to continue assisting them.

DISCUSSION

In a disciplinary proceeding, this court considers the evidence, the findings of the disciplinary panel, and the arguments of the parties and determines whether violations of KRPC exist and, if they do, what discipline should be imposed. Attorney misconduct must be established by clear and convincing evidence. *In re Foster*, 292 Kan. 940, 945, 258 P.3d 375 (2011); see Supreme Court Rule 211(f) (2019 Kan. S. Ct. R. 257). Clear and convincing evidence is "'evidence that causes the factfinder to believe that "the truth of the facts asserted is highly probable."'" *In re Lober*, 288 Kan. 498, 505, 204 P.3d 610 (2009) (quoting *In re Dennis*, 286 Kan. 708, 725, 188 P.3d 1 [2008]).

The respondent was given adequate notice of the formal complaint to which he filed an answer. The respondent was also given adequate notice of the hearing before the panel and the hearing before this court.

Each of respondent's exceptions to the panel's Final Hearing Report and his briefs in support of those exceptions has been carefully and thoroughly reviewed by this court. His attachments to his exceptions and the letters sent to the court after oral argument have not been considered, as they were not in evidence before the panel. Nearly all of the exceptions qualify as one or more of the following:  nonresponsive, irrelevant, attempted misdirection of this court's attention to examples of what the respondent believes are the impure motives or actions of others, and admissions against the respondent's interest.

For example, the respondent's exceptions numbered to correspond to at least the Final Hearing Report Paragraphs 2, 10, 17, 24, 25, 26, 28, 31, 33, 39, 40, 41, and 46 actually include no information that is contradictory to that contained in the Report.

Regarding relevance, among other things, the respondent fixates on the amount of money FNBO has spent on attorney fees in the multiple legal actions referenced by the panel, which has nothing to do with whether he committed the violations at issue here.

On misdirection, among other things, the respondent accuses FNBO's counsel of failing to abide by district court rules and the Kansas Code of Civil Procedure and of harboring racial animus. Even if each of these accusations had merit, which we do not decide, that merit would have no impact on whether the respondent committed the violations at issue before us today.

On admissions, at various points in his exceptions, the respondent asserts that he has offered to apologize to D.M. and pay $200 to D.M.'s favorite charity for calling D.M.

27

a Nazi; he does not, and, according to his testimony at the panel hearing, cannot deny having made the offensive remark in the first place. We note that this position marks a departure from the respondent's statement in the district court hearing on the motion to hold respondent in contempt that followed the name calling. At that point, the respondent said he did not remember calling D.M. a Nazi and asserted that "[s]omebody by the name of Blume would not" say that. With regard to the respondent's vulgar gesture toward the FNBO representative at G.O.'s deposition, the respondent asserts that the gesture was a spontaneous response to the representative's reference to being "'sick of this low rent guy,'" referring to respondent. Again, even if the representative engaged in less than appropriate behavior, the respondent does not deny that the vulgar gesture was made.

The variability in respondent's representations with respect to the discovery violation demonstrates his total inability to keep his story straight.

The petition the respondent filed on behalf of G.O. repeated unusual language from the email that was not produced until the deposition of J.S. And, when the respondent listed the materials that would be provided in response to the discovery request, he identified an email from J.S. Nevertheless, the next month, when he produced what he represented as all of the responsive documents in G.O.'s possession, he did not produce the email.

Three weeks later, the respondent attempted to use the unproduced email to impeach J.S. at his deposition. When this effort was challenged by opposing counsel, the respondent said he had not produced the email on behalf of G.O. because it was L.O.'s document and L.O.'s bankruptcy stay meant that L.O.'s discovery responses were not yet due.

Less than a month later, the respondent instead told Judge Vano that he had not produced the email because it was an "impeachment document."

In his still later written response to FNBO's motion for sanctions, the respondent gave multiple conflicting reasons the email had not been produced. None focused on the email's use for impeachment. The respondent took the position that he did not have to produce the opposing party's own document. He also said that counsel for FNBO was at fault for failing to question his representation that everything in G.O.'s possession had been produced, when the respondent earlier listed the email and it was not included. He also referred to the failure to produce the email as "inadverten[ce]" and "an oversight."

When Judge Vano held a hearing on the motion for sanctions, the respondent expressed his opinion that it was legally impossible for him to have withheld an "impeachment" document, revisited L.O.'s bankruptcy as an obstacle to production, and said for the first time that he gained possession of the email only one week before the deposition of J.S.

Later, when challenging Judge Vano's dismissal of G.O.'s claim as a sanction for the discovery violation, the respondent again insisted in his motion to alter or amend that he had disclosed the document and made it available to opposing counsel before the deposition. He did not mention that he had left it out of the group of documents produced and described by him as the entire universe of what was accessible to G.O.

At the hearing before the panel, the respondent confirmed on direct examination that on June 9, 2015, he had listed the email from J.S. as a document to be produced. He said that the email was L.O.'s and "not [G.O.'s] to hold" but nevertheless thought he had produced the document. He also confirmed that he had a copy of the document in his possession before the deposition of J.S. On cross-examination, the respondent said that he

29

did not believe he had the email at the time he drafted the petition on behalf of G.O.; did have it on June 9, 2015; and yet received a copy for the first time in late July 2015, shortly before the J.S. deposition. When questioned by the panel itself, the respondent said he had not turned over the email because he "figured [FNBO] had it."

Finally, in his exceptions to the Final Hearing Report, the respondent asserted that he had reviewed the email when drafting the petition filed for G.O. but did not keep a copy of it. He suggested that L.O. may have retrieved it from the respondent's office. He then said that the email again was in his possession about a week before the deposition of J.S. He also appeared to attribute the failure to produce the document to his opponent to a "flurry of activity" on related litigation.

Respondent's exceptions, overall, share the incoherence of his shifting position on the discovery violation. As a result, they are almost entirely unavailing to prevent our adoption of the hearing panel's findings of fact and conclusions of law. We have only two reservations, but the respondent's victories on these points are ultimately hollow for the reasons we now detail.

In both Paragraph 43 and Paragraph 48 of the Final Hearing Report, the panel agrees with Judge Vano's unflattering assessment of the respondent's motion to alter or amend the dismissal of G.O.'s claim and with Judge Hauber's similarly unflattering assessment of the respondent's motion to set aside the 2013 agreed journal entry of judgment. Both pleadings were, in the panel's ultimate estimation, frivolous. Thus their filings supported the panel's conclusions that the respondent violated Supreme Court Rule 3.1 requiring advocacy of only meritorious claims and contentions and Supreme Court Rule 8.4(d) (2019 Kan. S. Ct. R. 387) prohibiting conduct "that is prejudicial to the administration of justice."

The respondent's exceptions do not take a swing at Paragraph 43, but he states in response to Paragraph 48 that the "[t]he February 11, 2013[,] motion to [alter] or amend was not a frivolous filing" because he had a good faith belief that Judge Hauber should have set aside the earlier judgment. Although the use of the phrase "motion to alter or amend" is confusing, the respondent's inclusion of the date makes it obvious that he intended to refer to the motion to set aside he filed on July 5, 2016. His support for the motion at the time and through today is Judge Hauber's Division 7 Rule 9, a copy of which the respondent admitted as an exhibit before the hearing panel. The rule reads in pertinent part: "[A]greed orders . . . truly should reflect a signature of all impacted parties to avoid having such orders set aside if a party has not consented." Because only counsel for L.O. and not L.O. himself had signed the agreed journal entry in 2013, the respondent argued, the local rule made the agreed journal entry void ab initio.

Denial of a party's claim "does not, in and of itself, indicate the claim was frivolous," and the "party who asserts a pleading has no basis in fact and is not asserted in good faith has the burden of proving that assertion." *Giblin v. Giblin*, 253 Kan. 240, Syl. ¶¶ 3, 6, 854 P.2d 816 (1993).

Here, the 2013 agreed journal entry speaks for itself on the signatures it does or does not contain. The Disciplinary Administrator's office has not made any legal argument on why Rule 9 would have been inapplicable to the journal entry. And we do not regard the language of Rule 9 as so crystal clear that it could not be understood in the manner that the respondent argued it should, meaning there is room for good faith rather than bad faith in his filing.

This analysis means that we do not see clear and convincing evidence to support the panel's conclusions that the respondent violated Rule 3.1 and Rule 8.4(d) by filing a frivolous motion to set aside. Yet we have no hesitance in ruling that the respondent

31

committed two violations of each rule. The first of the violations of each rule is attributable to his filing of the motion to alter or amend; we detect no infirmity in the panel's conclusions on those issues. The second of the violations of each rule is new and occurred during the proceedings in this court.

As discussed above, the respondent sought a continuance of oral argument before this court, insisting that he must have additional time to obtain new counsel to assist him. Although his previous multiple pro se filings seemed to indicate otherwise, in an abundance of caution, this court granted the continuance. It is now evident that the respondent never intended to obtain new counsel. At oral argument, on questioning from this court, he admitted he never sought such counsel, giving a new cost-based excuse. Thus we now know the respondent made a frivolous request for a continuance. He took advantage of this court's grace, wasting judicial and Disciplinary Administrator resources, and violated both Rule 3.1 and Rule 8.4(d) a second time.

Thus, save our reservations on the material in paragraphs 43 and 48 of the Final Hearing Report explained above, we adopt the panel's findings of fact and conclusions of law. As the panel concluded, the respondent violated Rule 3.1 when he filed his motion to alter or amend; Rule 3.3(a)(1) when he was not candid about why the J.S. email was not produced before the J.S. deposition; Rule 3.4(d) when he failed to respond completely to discovery; Rule 4.4(a) when he attempted to use the unproduced document during cross-examination at the deposition of J.S., when he filed various motions for the purpose of delay and to burden the opposing party, when he called the deposition videographer a Nazi, and when he flipped off the representative of the opposing party; Rule 8.4(c) when he failed to be candid about when he acquired the J.S. email; and Rule 8.4(d) when he filed the motion to alter or amend.

We further find that the respondent filed a frivolous request for a continuance of oral argument before us, and we conclude as a matter of law that the filing constituted a second violation of Rule 3.1 and a second violation of Rule 8.4(d).

We next consider the appropriate disciplinary sanction. "This court is not bound by the recommendations of the Disciplinary Administrator or the hearing panel. [Citation omitted.] The court is free to impose a sanction that is either greater or lesser than that which is recommended." *In re Fickler*, 303 Kan. 504, 511, 362 P.3d 1102 (2015); see Supreme Court Rule 212(f) (2019 Kan. S. Ct. R. 261).

The respondent's failure to grasp the seriousness of his misconduct and his repeated dishonesty when that misconduct became the focus of the district court, the hearing panel, and this court persuade us that a severe sanction is necessary to force him to reflect and reform. Simply put, up until now, the respondent does not appear to have learned from his mistakes. He apparently still believes that, as long as he can convince himself he is a well-meaning, zealous advocate for the downtrodden, he can flout the rules of the court and the conventions of basic civility at will. His brief states that a "punch in the snout" would have been better medicine than a vulgar gesture for J.W. His oral argument was a textbook illustration for how to show zero understanding of what he did wrong or why he should be punished. He merely continued to urge the members of this court to "look over there," that is, anywhere but at his misconduct, the root of his disciplinary predicament.

Under these circumstances, an indefinite suspension from the practice of law is warranted. In addition, should the respondent seek reinstatement at some point in the future, he must undergo a Rule 219 hearing to demonstrate that he appreciates the wrongfulness and gravity of the misconduct leading to the suspension and intends to avoid a repeat of it.

CONCLUSION AND DISCIPLINE

IT IS THEREFORE ORDERED that respondent GREGORY V. BLUME be and he is hereby disciplined by indefinite suspension from the date of filing of this opinion in accordance with Supreme Court Rule 203(a)(2) (2019 Kan. S. Ct. R. 240). Should the respondent seek reinstatement, he will be subject to a reinstatement hearing under Supreme Court Rule 219.

IT IS FURTHER ORDERED that the respondent comply with Supreme Court Rule 218 (2019 Kan. S. Ct. R. 268).

IT IS FURTHER ORDERED that the costs of these proceedings be assessed to the respondent and that this opinion be published in the official Kansas Reports.